McEWEN, Respondent, v. GOTTHELF, Appellant.

(140 N. W. 264.)

1. **Tenancy in Common—Sale of Whole Property—Fiduciary Relations—Agency of Part Owner.**

    Where owners of realty are tenants in common, and one of them sells or negotiates for a sale of the whole property to a third person who is a stranger to such owners, such agency for sale raises a relation of trust between the owners, requiring honesty and fair dealing as between him who acts as such agent and his co-owners; and plaintiff, one of such co-owners, is entitled to recover of defendant, such agent, his, plaintiff's proportionate share of the proceeds of the sale, regardless of a contract between them which had not, either in its original or its changed form, been acted upon.

2. **Evidence—Value of Cotenant's Land Sold—Irrelevancy of.**

    In an action by one tenant in common of land against a co-owner who had as agent of plaintiff sold the land, evidence as to the value of the land, offered by defendant, is irrelevant.

3. **Trial—Jury Trial—Demand for Jury—Waiver.**

    In an action for an accounting between co-tenants of land, defendant not having demanded a jury trial, both parties having by notes of issue set the case for trial to the court, held, that even if the case were one triable to a jury, the right thereto was waived by defendant.

(Opinion filed March 11, 1913.  Rehearing denied April 22, 1913.)

Appeal from Circuit Court, Minnehaha County.  Hon. JOSEPH W. JONES, Judge.

Action by John F. McEwen against Ed. J. Gotthelf, for an accounty for proceeds of co-tenancy in land sold.  From a judgment, on trial to the court, for plaintiff and from an order denying a new trial, defendant appeals.  Affirmed.

*R. W. Parliman,* for Appellant.

The counsel says, that this optional contract, which is marked Exhibit "A" in this case, is not enforceable, is not binding, and is of no consequence of any name, nature or description, in this case. Is that not a queer position for the counsel to take when it appears

absolutely and unequivocally in this case, that the plaintiff has accepted the exact amount of the purchase price indicated in Exhibit "A" and has followed out the terms and conditions of the optional contract, Exhibit "A," as changed on the 7th day of August, 1911, and which we claim under in this case, and which we claim is binding in every respect upon the parties to it.

We say there is no power on earth that can obliterate this contract, Exhibit "A" and do justice between these parties. There is nothing that can wipe this out of existence, ignore it and proceed upon the theory that no such thing ever existed. This plaintiff cannot claim rights and privileges which are enforceable by virtue of this contract, "Exhibit "A," and then turn around and deny the existence of the same when it applies to this defendant and is in his favor.

On page 65 of the record Mr. Lynch relates the conversation which took place between the plaintiff and the defendant on the 11th of September, 1911. In that conversation the plaintiff plainly and unequivocally states that he does not care what the defendant is getting over and above the $37,000 for the land, and he hoped that he would do well and he does not care if he gets a hundred thousand dollars over and above it. (P. 66 record.)

So, I say, looking at this proposition from every view point possible, that there is nothing in the whole transaction that savors of fraud or a misrepresentation.

That the issues between the parties, as disclosed by the evidence, was one triable in a court of law before a jury, and the proceedings by the trial judge in deciding such action after the evidence, failed to sustain the complaint, deprived the defendant of his constitutional right to a trial before a jury of his peers.

It appears from the pleadings and the evidence in the case, that if there was such a thing as a trusteeship for the plaintiff, of the proceeds received from the land, over and above the Thirty-seven Thousand Five Hundred ($37,500) Dollars, the trusteeship was entirely closed and the amount due to the plaintiff was fixed, being the property received by the trustee. Crystal v. Gerlock, 25 So. Dak., 128; Merriam v. Johnson, (Minn.) 90 N. W. 116.

The defendant has a constitutional right in this case, of a trial by a jury. Albien v. Smith, 19 S. D. 421.

Now, this contract not being satisfactory to either party, was changed on the 7th day of August, to read as it now is. The defendant testified positively, when the contract was executed and delivered on August the 7th, between himself and plaintiff he had no knowledge of what he was to get, except what he told plaintiff. (P. 13-14-15 record). Then plaintiff testifies as a direct corroboration of this, (P. 48 record), "Q. Did he tell you, at that time, that he thought he could get from Schamber Thirty-seven Thousand Five Hundred ($37,500) Dollars, in notes?" "A. Yes, about that amount, I guess." "Q. Did he say anything about being able to get in addition, a store and building in Alpena?" "A. He said, perhaps Schamber had some property he might want to trade in and mentioned Alpena."

It is elementary that one tenant in common may exercise a power of sale for co-owners. Stanley v. Payne, 119 N. Y. S. 570.

And so in the case at bar, in view of the provisions of the contract Exhibit "A" and of the testimony in the case, it, (Exhibit "A") was a trust to sell for the benefit of co-owners, at a fixed price. Stanley v Payne, supra.

## IN REPLY.

Respondent testifies that it was August the 20th when he, Lynch and appellant went to Canton together and that was the day respondent delivered his deed to appellant. Respondent then had had his conversation with Schamber, when he got the "straight of the Alpena deal," nearly a week before he delivered his deed and closed the deal. (P. 47, Record.) He says he got the straight of it from Schamber, a week, nearly, before he closed the deal; again I say where is the fraud? Where is the misrepresentation? It is just as I have always contended, respondent knew the whole deal from "A" to "Z"; closed it up knowing the exact facts; got his notes for $11,999.00 in his pocket, and then attempts to soak this appellant, by claiming he was deceived.

So, it is undisputed that, appellant informed respondent of everything he knew about the deal; and that on the 7th day of August, respondent knew as much about it as appellant.

"One is not received by an alleged false representation when he admits he had knowledge of its falsity." Griffin v. Griffin, 61 S. E. 16.

False representations made; after a contract of sale has been consummated, are not actionable. Farmers Stock Breeding Assn. v. Scott, (Kas.) 36 Pac. 978.

*Aikens & Judge,* for Respondent.

Appellant's counsel seem to lose sight of the fact that it is respondent's claim that appellant procured the deed to be executed by falsely representing to respondent the amount of consideration that he had received from Schamber in exchange for the timber land. According to appellant's story; it was not known by him and consequently he could not disclose to respondent just how much he was to receive when they had their talk on the 7th day of August, 1911. But if respondent is to be believed, and the judge who tried the case believed him, when the real inquiry was made as to what respondent was to get out of the transaction, he was told, and was made to believe, by appellant, that he was to receive one-third of the notes, amounting to twelve thousand five hundred dollars, and that appellant was to get twelve thousand five hundred dollars in notes and in addition thereto a stock of hardware at Lane, of the value of not more than fifteen hundred dollars. If this transaction was open and aboveboard, if there was no fraud or deceit mixed in this affair, why did appellant make such a statement.? Why did he not say that he had received a store building and two lots and a stock of merchandise in Alpena, that invoiced in January anywhere from nineteen thousand to twenty-nine thousand dollars?

Resolved to a nut shell, this is the condition: Gotthelf misled respondent on the 7th day of August, 1911, respecting his transactions of making a deal with Schamber. Between the 7th day of August, and the 12th day of August, appellant succeeded in making the deal with Schamber and he withheld the information from respondent. Appellant continued to withhold the information from respondent until the day of the execution and delivery of the deed when he is pinned down by the interrogations of respondent and then he is forced to tell the lie that is the real gravamen of the case. The proof is ample to substantiate this proposition.

We assert that the contract (Exhibit "A") is not to be considered. It is a pure question of fraud and deceit.

Again, even though an action brought on the equity side of the court might be wanting in the equitable facts pleaded, yet the court might render a judgment as upon a money demand. We fail to find

anywhere in the record any claim made during the trial, of the right of the defendant to a jury. He would have been promptly accommodated with a jury.

Par. 1287. Civil Code. A contract in writing may be altered by a contract in writing or by an executed oral agreement, and not otherwise.

Par. 1289. The intentional destruction, cancellation or material alteration of a written contract, by a party entitled to any benefit under it, or with his consent, extinguishes all the executory obligations of the contract in his favor, against parties who do not consent to the act. (See Finding XI.) Deceit.

§1293. Civil Code.

We cite, as to trust relations: Sects. 1624, 1626, 1618, Civ. Code; As to good faith, Sec. 2448, Civ. Code. Decisions applicable here: Davenport v. Buchanan et al., 6 S. D. 376; National Bank of Dakota v. Taylor, 5 S. D. 99; Burt v. C. Gotzian & Co., 102 Fed. Rep. 937.

GATES, J. This action was begun in October, 1911, for an accounting between tenants in common upon the sale of their land and for the recovery by plaintiff of his alleged share of the additional consideration received by defendant over and above the amount reported by defendant to plaintiff. The action was tried by the court without a jury. The court found that the defendant knowingly and fraudulently withheld from plaintiff the facts in regard to such additional consideration for the purpose of cheating and defrauding plaintiff. Judgment was entered in favor of plaintiff and against the defendant for the sum of $5,000 and interest. The claim of the plaintiff rests upon alleged fraud and deceit on the part of defendant in the transaction while defendant relies upon a contract. On July 11, 1911, the plaintiff and defendant and defendant's brother, M. J. Gotthelf, were, and had been for some years prior thereto, the owners of a large tract of pine land in the counties of Custer and Pennington, in this state, each owning an undivided one-third thereof. On that date plaintiff delivered to defendant a contract in writing, whereby he agreed at any time on or before July 11, 1912, upon payment to him of the sum of *$10,962.83, and the cancellation of any and all indebtedness owing from him to defendant* to convey to defendant his undivided one third of said property. Said contract further provided:

"This is strictly an optional contract, which if the said Ed. J. Gott-helf fails to make said payment, I cancel said obligations and in-debtedness on this contract and same shall be void." On August 5, 1911, defendent went to Freeman, S. D., and had a talk with John Schamber about selling him the whole property. On August 7th defendant invited plaintiff to his home and the contract was altered by striking out the consideration as underscored above, and in-terlining the following as the consideration: "$11,999 in cash or good security, such as the said Ed. J. Gotthelf and M. J. Gotthelf is willing to take for their interest" in the property. Defendant's evidence tends to show that this change was made with plaintiff's consent. Plaintiff's evidence tends to show that the change was made without his consent. On August 12, 1911, defendant closed the deal with Schamber for the entire property, taking notes for the sum of $36,750, secured by collateral notes, together with a build-ing and lot and stock of goods at Alpena, S. D., which were put in at the trading price of $27,250 making the total nominal con-sideration $64,000. Defendant took possession of the store build-ing and stock of merchandise at Alpena on August 14, 1911, but the deeds were not delivered to Schamber until on or about August 29, 1911. He conducted the store business until November, 1911, when he traded the lot and building and remainder of the mer-chandise for land. Defendant caused the title of this land to be placed in the name of defendant's wife. The only consideration re-ceived by plaintiff for his interest in the property was notes to the amount of $12,250. Plaintiff did not learn the truth of the trans-action until September 13, 1911.

The court found the Alpena property and merchandise to be worth not less than $20,000 at the time defendant took possession, but limited plaintiff's recovery to $5,000, instead of fixing at at one-third of $20,000.

[1] That the trial court was right in determining that plain-tiff was entitled to recovery in some amount appears to be fully established from the testimony of the defendant without recourse to the testimony of the plaintiff, because it clearly appears that de-fendant was therein acting as plaintiff's agent. Following are por-tions of the transcript of defendant's testimony: "Q. What did you tell him (plaintiff) on the 7th day of August, 1911? A. I told him —I says: 'Mack, I want to know just exactly where I am at on

this proposition. . I want to know. just what I can do. I have been over to Freeman and had a talk with Schamber, and I want to know what you will take for your one-third interest in this timber, before I start, because I have had several deals on, and when I came to close them, I found hitches, and I want to know this time exactly where I am at. What will you take for your interest?' We talked back and forth, and he says: 'I will take $12,500 in securities the same as your brother and you are willing to take for your share, less the actual expenses you have been to in selling this timber.' After we had talked this over we made that contract as changed. Q. And you stated all you said to him at that time about the Schamber matter? A. Well, he wanted to know of me what I was getting for it, and I told him I though I could get $37,500 in notes; that is, secured by collateral notes, and stock of merchandise and store building in Alpena. Q. Did you say anything about the value of those? A. No, sir. Q. You did not say whether the value of those was $500 or $50,000. A. No. I told him at the time and in that same conversation I says: 'Mack, I have been to a whole lot of trouble in selling this timber. I sold it four times and whatever I get over and above $37,500 I will keep for my commission in making this deal.' He says: 'That will be perfectly satisfactory to me.' Q. Did he ask you how much this stock of merchandise and real estate in Alpena was worth? A. He asked me if I knew how much it was worth; that is, how much that stock would invoice. I told him that I did not know; that I had not invoiced it or got that far along; that I had not got that far along with the deal, but that I thought I could close the deal. * * * * Q. On the 7th you told McEwen that Schamber would give you $37,500 in notes? A. I told him I could get it, I thought. Q. Why did you think you could get $37,500 in notes if you and Schamber did not have five minutes talk? A. Simply because we talked along and I drew enough out of him to infer I could make that kind of a deal, but I was not certain. Q. You did that in five minutes. A. Yes, sir. Not to exceed ten minutes at least. Q. Also, you drew out of him on the 5th of August in five minutes talk that he would give you a stock of merchandise, store and lots in Alpena? A. He says: 'Ed., if you would take in my store at Alpena, I might trade with you.' I asked him what his store was, and he told me. Q. What did he tell you? A. He says then: 'I have got

a general stock and building. There is a mortgage on the building of $1,000.' I says: 'How about the balance Mr. Schamber?' 'Well. he says, 'I suppose I can give you my notes and put up some collateral notes.' Q. Schamber did not say anything about how much of a stock he had there? A. Yes, sir. Q. What did he say? A. He said the 1st of January, if he remembered right, it had invoiced somewhere $19,000. Q. But you did not tell your partner here that did you, Mr. McEwen? A. No, sir. Q. Did you say it invoiced $19,000. A. No, sir. Q. You kept that for yourself? A. I had made a deal with him what he was to have for his interest. Q. When you changed this contract and got a new one, you did not tell him there was $19,000 stock of goods? A. I told him there was a stock of merchandise. Q. You did not tell him how much? A. No, sir; absolutely no." Plaintiff testified to the following conversation had between him and defendant on August 20, 1911: "I asked him how the deal was coming on. He said that he had got an offer from Schamber of $37,500 in notes, and that he had also a stock of hardware at Lane, S. D. I asked him what the stock of hardware was worth. He said he thought perhaps he could get $1,500 for it. He says: 'I have done a good deal of work on this thing. I think I ought to have it for my commission.' I asked him where in the town of Lane, and he described it. I had been there. I said I thought he earned that much commission, and, if that was all there was of it, he could have it." It is undisputed that at the date of this conversation defendant had been for six days in possession of the store at Alpena.

There was no evidence tending to show that the defendant did not act in good faith in securing the contract in its original form on July 11, 1911. It is clear, therefore, that at any time within the year plaintiff would have been bound to convey his interest in the property to defendant upon the payment by defendant to plaintiff of the sum mentioned in the contract.

Whether defendant was bound to act in good faith with plaintiff in securing a modification of the optional contract, or whether defendant was legally authorized to treat plaintiff as a stranger for the purpose of securing the modification of such contract, it is not necessary for us to decide, because no sale was made under the contract.

In the case of tenants in common acquiring title by descent the

courts have almost uniformly held that a fiduciary relation exists between them. In cases where the tenants in common acquire their interests from different owners, the decisions of the courts are not uniform. Some courts hold that in matters strictly between themselves there is no fiduciary relation; while other courts hold the trust relation to exist as in the case of tenants in common by descent.

But the rule is firmly established that, when one tenant in common acts as agent for the sale of the whole property to a stranger, then the fiduciary relation arises. It is therefore not necessary for us to decide whether sections 1201, 1202, 1292 and 1293 of the Civil Code apply to the relations of the parties to this action so far as concerns the obtaining of the alteration of the contract between them on August 7, 1911, even if it be assumed that the contract was altered by consent. The evidence shows without contradiction that the parties did not act under that contract either in its original form or as amended. The evidence clearly shows that in the making of the sale of the interest of the three owners of the property to Schamber the defendant was acting as agent for his cotenants. The trial court was therefore right in finding that the contract was irrelevant to any of the issues of the case. In the case of Calkins v. Worth, 215 Ill. 78, 74 N. E. 81, the court said: "It is contended by appellant that the parties were mere tenants in common, and that a fiduciary relation does not arise in law from such ownership. With the proposition of law we do not take issue. * * * The owners as related to their separate interests could undoubtedly deal with each other as strangers. One could sell to the other at such price as he deemed fit, and thus far the rule contended for by appellant is sound and could be applied, and within that rule each could sell to a stranger on terms that suited him and the other could not complain. But when either attempted to sell or began negotiations for the sale of the whole property, not only his own, but the share of the other, to a stranger, then the law raised a relation of trust between them that required honesty and fair dealing." In the same case in the Appellate Division the court said: "In making this sale, Calkins was plainly the agent of his co-owner, as such agent he owed to his partner the duty of acting in the transaction with common honesty and straightforward fairness. This law is so elementary that even the layman understands it."

117 Ill. App. 478; 38 Cyc. 15; Garr v. Boswell (Ky.) 38 S. W. 513; Lewis v. Jacobs, 153 Mich. 664, 117 N. W. 325; Purslow v. Jackson, 93 Iowa, 694, 62 N. W. 12; Walker v. Evans, 98 Mo. App. 301, 71 S. W. 1086; 2 Pomeroy, Eq. Jur. § 959; Hoyt v. Lightbody, 98 Minn. 189, 108 N. W. 843, 116 Am. St. Rep. 358, 8 Ann. Cas. 984. See, also, Gamble v. Loffler, 28 S. D. 239, 133 N. W. 288.

[2]   Appellant's sixth assignment of error relates to the exclusion of testimony offered by defendant to show the value of the pine lands owned by the cotenants. Even if, as is claimed by defendant's counsel, the lands were not worth to exceed $37,500, we fail to see what bearing such evidence would have upon the issues in this case. There was no error in such ruling.

[3]   In the appellant's nineteenth assignment, the claim is set forth that this action should have been tried by jury. No record of any such demand by the defendant appears in the proceedings had at or before the trial of the case. The claim was first made in the specification of errors in the bill of exceptions. It appears that both parties by their notes of issue set the cause for trial by the court. Even if this had been a case properly triable by jury, the right thereto was waived by defendant. Chrystal v. Gerlach, 25 S. D. 128, 125 N. W. 633; De Laney v. Western Stock Co., 19 N. D. 630, 125 N. W. 499.

There were in all 41 assignments of error set forth by appellant. A large number of these are disposed of by the decision herein in regard to the fiduciary relation between the parties. The remaining assignments relate to alleged errors in admitting or excluding testimony. We have carefully examined all of them, and the portions of the transcript referred to, and we are clear that there was no prejudicial error in any of the rulings of the court upon which the same were based.

The judgment and order denying new trial are affirmed.